***********
In accordance with the Opinion of the Court of Appeals, the Full Commission amends its prior Opinion and Award as follows:
 EVIDENTIARY RULING
The exhibits regarding plaintiff's wages after January 28, 1996 attached to plaintiff's submission filed on October 7, 2002 are hereby made a part of the evidentiary record in this matter. Defendant submitted no rebutting wage exhibits.
 ***********
Based upon the evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. As stipulated by the parties, the plaintiff's average weekly wage with the defendant employer as of his August 1, 1995 date of injury was $296.69. However, at all times relevant to this claim, the plaintiff was most definitely not an "illegal alien". See plaintiff's Exhibit 3 (valid employment authorization and social security number for plaintiff issued as of 1/31/00). Defendants' statement to the contrary at page 1 of their September 25, 2002 submittal is incorrect in that regard.
2. In ¶ 8 at pages 4-5 of the Full Commission's OA filed on February 23, 1999, and in ¶ 10 at pages 4-5 of the Full Commission's OA filed on February 6, 2001, the Full Commission determined that the plaintiff "resigned [his job at Quality Molded Plastics] due to complaints of pain and discomfort in his left thumb and forearm." These findings were based upon undisputed testimony given by the plaintiff at his February 24, 1997 hearing. See Transcript of the Evidence ("TEE") filed March 2, 1998, p. 44, lines 2-25; and p. 45, lines 1-20. After the plaintiff filed a motion for reconsideration with respect to a question of law that affected the amount of benefits awarded to the plaintiff in that February 6, 2001 OAE, the Full Commissionsua sponte revised its February 23, 1999 and February 6, 2001 OA's to delete the language from ¶¶ 8 and 10 of its February 23, 1999 and February 6, 2001 OA's, respectively, in another OA filed on March 16, 2001. That language was apparently deleted based upon the Full Commission's view that "the incomplete wage records from Quality Molded Products" "failed to prove that [the plaintiff] has sustained a wage loss after 28 January 1996 as a result of his 1 August 1995 injury." March 16, 2001 OA, p. 5, ¶ 11.
3. The North Carolina Court of Appeals reversed that determination based upon the documentary evidence set forth at pages 21-25 of the Exhibits attached to the Transcript of the Evidence ("TEE"). In rendering its decision, the Court of Appeals determined:
 "The wage records show that plaintiff began working for QMP at a wage of $5.00/hour, which was eventually increased to $5.20/hour. Although the records indicate that plaintiff worked full-time and overtime hours in January and February of 1996 [with Quality Molded Plastics], plaintiff's earnings statements from March and May of 1996 reveal that plaintiff's hours were reduced to part-time, and plaintiff received no overtime wage. At the time of his injury with defendant — employer, plaintiff was working eight hours per day, five days per week, at an hourly wage of $6.40/hour.
 We conclude that plaintiff met the initial burden of proving disability by demonstrating that he obtained other employment at a wage less the wage earned prior to his injury. Plaintiff's earnings statements reveal that his hourly wage at QMP was substantially lower than the hourly wage he earned with defendant-employer, and that his work hours were significantly shorter."
Felix Olivares-Juarez v. Showell Farms, Inc., et al., COA1-714 (filed July 16, 2002 slip opinion), p. 4.
4. Defendants correctly state that the Court of Appeals then remanded this action to the Full Commission "to determine whether Showell Farms has rebutted" the plaintiff's showing of disability under N.C. Gen. Stat. § 97-30. However, the defendants are not correct in their contention that this "remand was for no other reason than a procedural technicality". This contention by defendants completely overlooks the substantial nature of the plaintiff's claim for benefits under N.C. Gen. Stat. § 97-30
based upon the evidence of record and the additional evidence proffered by plaintiff on October 7, 2002.
5. Defendants' contention that the plaintiff "can hardly now suggest that his earning capacity was nonetheless somehow diminished after he began employment" at QMP based upon a review of some of the QMP paycheck stubs that set forth at pages 21-25 of the Exhibits attached to the TEE flies in the face of the controlling rationale of the Court of Appeals. Plaintiff contends, as the Court of Appeals found and as the Full Commission concurs, that the "relevant" wage data for determining wage earning capacity in the plaintiff's employment with QMP included all of the QMP paycheck wage data that appears in pages 21-25 of the Exhibits attached to the TEE. Defendants cannot rebut the plaintiff's proof of loss of earning capacity by attempting to draw some artificial dividing line in the QMP wage data which artificial dividing line has already been rejected by the Court of Appeals. This is especially true when the hearing testimony indicated that the plaintiff was unable to continue with the QMP job due to problems with his injured arm that were related to his QMP work duties.
6. Based upon the substantial change of conditions in both the plaintiff's immigration status and his employment status that has occurred since the Commission issued its OA's in 1999 and 2001, the Full Commission has considered all of the documentary evidence in making its determination on remand.
7. The Full Commission makes the following findings of fact with respect to the average weekly wage of Felix Olivares-Juarez after return to work.
 A. First Post Return to Work ("RTW") Employer — Quality Molded Products (QMP)
 i. Gross Wages earned with this employer: $2,953.84 (using the year to date gross wages from plaintiff's last paycheck from Quality Molded Products for the bi-weekly pay period ending with May 19, 1996 that appears at page 25 of the Exhibits attached to the Transcript of the Evidence (hereinafter referred to as the "TEE").
 ii. Number of weeks employed by this employer = 16 weeks (Based upon the first paycheck stub for QMP set forth at page 21 of the TEE, the plaintiff started work with QMP on 1/28/96. Based upon the last paycheck stub set forth at page 25 of the TEE, the plaintiff ended that employment on May 19, 1996).
 iii. Average Weekly Wage at Quality Molded Products: $2,953.84 (gross pay) divided by 16 weeks equals $184.62 average weekly wage with QMP
 iv. "On 29 January 1996, plaintiff obtained employment inspecting finished parts at quality molded products, where he continued to experience pain in his left arm due to the 1 August 1995 injury. Plaintiff resigned his position on 19 May 1996 due to complaints of pain and discomfort in his left thumb and forearm." Pg. 2 of 16 July 2002 N.C. App. Decision.
 B. Second Post RTW Employer — Glendale Hosiery ("GH") d/b/a Phantom USA
 i. Gross Wages earned with this employer in 1996: $4,942.58 (using the year to date gross wages from plaintiff's last two (2) paychecks from GH for the bi-weekly pay period ending with December 28, 1996 that appears at pages 29-30
of the TEE.
 ii. Number of weeks employed by this employer = 21 weeks (Based upon the first bi-weekly pay period information for GH set forth at page 26 of the TEE, the plaintiff started work with GH on August 3, 1996. Based upon the last paycheck stub set forth at page 25 of the TEE, the plaintiff's 1996 employment with GH ended on December 28, 1996).
 iii. Average Weekly Wage at Quality Molded Products: $4,942.58 (gross pay) / 21 weeks = $235.36 average weekly wage with GH.
 iv. "On 3 August 1996, plaintiff began employment with Glendale Hosiery Company earning a lesser wage than he received with defendant-employer." Page 2 of 16 July 2002 N.C. App. Decision.
 C. Third Post RTW Employer — Phantom USA ("PUSA") d/b/a Glendale Hosiery
 i. Gross Wages earned with this employer in 1997 ending On February 27, 1997: $2,525.91 (using the statement contained on page one of Plaintiff's Exhibit 1, and the year to date gross wages from plaintiff's first and last paychecks attached to Plaintiff's Exhibit 1 for PUSA for the bi-weekly pay period ending with January 11, 1997 to February 27, 1997 that is included in the paycheck stub set forth in the second page of Plaintiff's Exhibit 1 to the pay period ending Mach 8, 1997 that appears in the paycheck stub set forth in the last page of Plaintiff's Exhibit 1).
 ii. Number of weeks employed by this employer = 9 weeks (Based upon the same wage data referred to in ¶ 3a above.
 iii. Average Weekly Wage at PUSA for 1997: $2,525.91 (gross pay) / 9 weeks = $280.66 average weekly wage with PUSA
 D. TTD was resumed per Form 62 filed June 7, 2000 See copy of Form 62 dated June 7, 2000 for reinstatement of TTD on October 29, 1999.
 E. Plaintiff obtained valid work authorization and attempted to obtain work.
 i. On January 31, 2000, the plaintiff obtained a valid Employment Authorization Card and Social Security Number from the federal government. Plaintiff's Exhibit 3 (copy of same). On November 15, 1999, the plaintiff also obtained a valid North Carolina driver's license in his own name. Id.
 ii. After plaintiff's medical situation improved, he unsuccessfully applied for employment with several employers. Plaintiff's Exhibit 4. One employment that the plaintiff was not able to obtain was poultry processing work.
 F. Fourth RTW Employer — Central Carolina Community College ("CCCC") as Instructor Aide for 2001 and 2002 — Plaintiff's Exhibit 5 (copy of W-2 for 2001 with copies of paycheck stubs and time sheets), and plaintiff's Exhibit 6 (copies of paycheck stubs and time sheets through 8/31/02).
 i. Gross Wages earned with CCCC in 2001: $1,562.00 (using the W-2 statement contained on page one of plaintiff's Exhibit 5.
 ii. Number of weeks employed by CCCC in 2001 = 7 months or 28 weeks (Based upon the paycheck stubs and time sheets that appear on pages 2-12 of Plaintiff's Exhibit 5).
 iii. Average Weekly Wage at CCCC for 2001: $1,562.00 (gross pay)/ 28 weeks = $55.79 average weekly wage with CCCC in 2001
 iv. Gross Wages earned with CCCC in 2002: $1,386.00 (using the year to date (YTD) total on the 8/31/02 paycheck stub that appears at page 9 of Plaintiffs Exhibit 6).
 v. Number of weeks employed by CCCC in 2002 = 7 months or 28 weeks (Based upon the paycheck stubs and time sheets that appear on pages 2-11 of Plaintiff's Exhibit 6).
 vi. Average Weekly Wage at CCCC for 2002: $1,386.00 (gross pay) / 28 weeks = $49.50 average weekly wage with CCCC in 2002
 ***********
Based upon the foregoing findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Defendants have not rebutted plaintiff's showing of disability under N.C. Gen. Stat. § 97-30.
2. Plaintiff is entitled to wage loss benefits for each week during the 300-week period beginning August 1, 1995 in which he was unable because of his compensable injury to earn an average weekly wage of $296.69 and was not receiving temporary total disability benefits. N.C. Gen. Stat. § 97-30.
3. Plaintiff is entitled to temporary total disability under N.C. Gen. Stat. § 97-29 for those weeks in which he was not able to earn any wages by reason of his compensable injury.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney fee hereafter awarded, defendants shall pay to plaintiff weekly compensation at the rate of $197.80 per week for each week during which plaintiff was unable to earn any wages by reason of his compensable injury.
2. Subject to the attorney fee hereafter awarded, defendants shall pay to plaintiff two thirds of the difference between his established average weekly wage at the time of injury of $296.69 and any lesser wage that he actually earned in any week during the 300 week period following August 1, 1995.
3. Both the amounts in paragraph one and paragraph two of this award have already accrued and shall be paid in a lump sum. Three quarters of each lump sum shall be paid to plaintiff and one quarter of each lump sum shall be paid directly to plaintiff's attorney.
4. Defendants shall pay to plaintiff interest at the rate of 8% per annum on all compensation due under paragraphs one and two of this award from the date of the hearing before the Deputy Commissioner, February 24, 1997.
5. Defendants shall pay the costs.
This 29th day of December 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DISSENTING:
 S/____________ BUCK LATTIMORE CHAIRMAN